IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 09-cv-00629-PAB-KMT

ROSETTA J. GRIGGS and
V.K. SURESH RAJAN,
derivatively on behalf of Nominal Defendant Intrepid Potash, Inc.,

      Plaintiffs,

v.

ROBERT JORNAYVAZ III,
HUGH HARVEY JR.,
J. LANDIS MARTIN,
TERRY CONSIDINE,
BARTH WHITHAM, and
PATRICK AVERY,

      Defendants,

and

INTREPID POTASH, INC.,

      Nominal Defendant.
_____

**ORDER**
_____

      This matter is before the Court on the motion to dismiss plaintiffs' first amended shareholder derivative complaint [Docket No. 26] filed by nominal defendant Intrepid Potash, Inc. and defendants Robert P. Jornayvaz III, Hugh E. Harvey Jr., J. Landis Martin, Terry Considine, and Barth E. Whitham.  Defendant Patrick Avery has filed a motion to join in the motion to dismiss [Docket No. 28].  The motions are fully briefed and ripe for disposition.

## I. BACKGROUND[1]

Plaintiffs Rosetta Griggs and V.K. Suresh Rajan bring this derivative lawsuit on behalf of Intrepid Potash, Inc. ("IPI"), a corporation with its principal executive offices in Denver and incorporated under Delaware law.  Am. Compl. ¶¶ 12-14.  In their first amended complaint [Docket No. 22], plaintiffs allege that three of IPI's board members, defendants Robert Jornayvaz III, Hugh Harvey, Jr., and J. Landis Martin, "loot[ed] the company for their own personal gain" and engaged in a series of self-dealing transactions.  Am. Compl. ¶ 3.  In addition to serving on IPI's board of directors, defendant Jornayvaz also serves as IPI's Chief Executive Officer and defendant Harvey serves as its Chief Technology Officer.  Based on these allegations, plaintiffs assert causes of action against IPI's five directors for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and self-dealing. The Court's jurisdiction is based on diversity of citizenship.  28 U.S.C. § 1332(a).

### A.  Parties

Plaintiffs are shareholders of IPI and allege that they have "continuously held [IPI] common stock at times relevant to" the allegations in the amended complaint. Am. Compl. ¶ 69.

IPI primarily produces and markets muriate potash, which it sells as an agricultural fertilizer, a component in drilling fluids, and an animal feed nutrient.   Am. Compl. ¶ 2.  The company was originally formed in November 2007 as a wholly owned subsidiary of Intrepid Mining, a closely held corporation owned by defendants

---

[1]The Court draws the following facts from the first amended complaint [Docket No. 22].

Jornayvaz, Harvey, and Potash Acquisition, LLC.  Am. Compl. ¶¶ 39, 4.  Potash

Acquisition, LLC is, in turn, owned by a venture capital firm, of which Martin is a general

partner.  Am. Compl. ¶  4.  As of the filing of the amended complaint, IPI's five-member

board of directors ("the board") consisted of: Jornayvaz (President, Chief Executive

Officer and Chairman of the Board), Harvey (Chief Technology Officer and Chief

Operating Officer), Martin (member of the Audit, Nominating and Governance, and

Compensation Committees), Considine (member of the same committees), and

Whitham (member of the same committees).  Am. Compl. ¶ 70.

### B.  Alleged Wrongdoing Surrounding the IPO

On April 17, 2008, IPI filed an Amended Form S-1[2] with the SEC.  Am. Compl. ¶

39.  Plaintiffs allege this document contained a number of misrepresentations, including

that the company's sole product being potash was a strength and not a weakness, that

the company's location was an asset and not a liability, and that the company had

successfully stabilized potash production at a particular declining mine.  Am. Compl. ¶¶

49 - 51.  Further, the Amended Form S-1 misrepresented defendant Avery's educational

credentials.  Am. Compl. ¶ 62.  Avery served as IPI's President and Chief Operating

Officer until February of 2009, when his misrepresentations regarding his education

became public and he resigned.  Am. Compl. ¶¶ 62, 64.

---

[2] Plaintiffs refer to this document as the "Registration Statement," see Am. Compl. ¶ 39, while defendants call it "the prospectus." Defs.' Mot. to Dismiss ("Defs.' Mot.") at 2.

IPI began its Initial Public Offering ("IPO") in April of 2008.[3]  Am. Compl. ¶ 4.  On April 21, 2008, IPI purchased the assets and debts of Intrepid Mining.  Am. Compl. ¶ 55. Plaintiffs allege IPI's IPO was intended to raise money to purchase the ailing Intrepid Mining, which defendants Jornayvaz, Harvey and Martin had "milked . . . to maximize their personal profits. . . ."  Am. Compl. ¶ 6.  Plaintiffs allege that prior to the formation of IPI, Intrepid Mining paid several large cash distributions to Jornayvaz, Harvey and Potash Acquisition, resulting in a large debt which was subsequently paid off with money raised from the IPO.  Am. Compl. ¶¶ 35-38.

### C.  Alleged Self-Dealing After the IPO

Plaintiffs additionally allege that after IPI went public, defendants Jornayvaz, Harvey, and Martin engaged in a series of self-interested transactions.  The first of these transactions involved Intrepid Oil, a corporation privately owned by Jornayvaz and Harvey.  Am. Compl. ¶ 45.  Plaintiffs allege that on April 25, 2008, IPI finalized a "sweetheart agreement" with Intrepid Oil, which allowed Intrepid Oil to drill an oil and gas well on the property over IPI's Moab Mine, despite IPI's efforts to keep other outside oil and gas companies from drilling near IPI's mines.  Am. Compl. ¶ 45.  The deal also gave Intrepid Oil the right "to use up to 15 percent of [IPI's] employees' time for certain accounting, geological, land title and engineering services," and promised that IPI would buy the well back in the event it did not produce at commercially viable levels.  *Id.*

Next, plaintiffs allege that in December 2008 IPI entered into sublease agreements with the Larrk Foundation and Intrepid Production.  Am. Compl. ¶ 59.

---

[3]  The exact date the IPO was completed and the date on which IPI became publicly traded are matters of some dispute, as discussed below.

Jornayvaz owns Intrepid Production and serves as a trustee of the Larrk Foundation, a non-profit organization. *Id.* Plaintiffs allege that these subleases were "gifts" to Jornayvaz because they included lengthy lease abatement provisions. *Id.*

Similarly, plaintiffs allege that IPI entered into "dry lease" agreements with entities owned by Jornayvaz and Harvey for the rental of company aircraft. Am. Compl. ¶¶ 60-61. Plaintiffs first allege that IPI agreed, sometime after May of 2008, to lease aircraft from BH Holdings, a company "created" by Jornayvaz and Harvey. Am. Compl. ¶ 60. Second, plaintiffs allege IPI entered into a dry lease agreement in January of 2009 with Intrepid Production Holdings, LLC, an entity owned by Jornayvaz. Am. Compl. ¶ 61. Plaintiffs allege these agreements allow Jornayvaz to "improperly personally profit[] when he flies on the Company's leased aircraft." *Id.*

### D.  Defendant Martin's Insider Trading

Finally, plaintiffs allege that in May of 2009, director Martin engaged in insider trading by selling 800,000 shares of IPI at a large profit. Am. Compl. ¶ 67. IPI's stock price had risen in the weeks prior to Martin's sale due to rumors that IPI was going to be taken over. Am. Compl. ¶ 65. The New York Stock Exchange asked IPI to issue a public statement explaining any corporate developments that might account for such rumors, but IPI declined to comment. Am. Compl. ¶¶ 66, 67. Plaintiffs allege that Martin sold his shares "while in possession of material non-public information that [IPI] refused to divulge to the investing public." Am. Compl. ¶ 82. However, the amended complaint does not specify what information Martin actually possessed.

## II.  DEFENDANTS' MOTION TO DISMISS

5

Nominal defendant IPI and individual defendants Jornayvaz, Harvey, Martin, Considine and Whitham filed a motion to dismiss pursuant to both Rule 23.1 and Rule 12(b)(6) of the Federal Rules of Civil Procedure [Docket No. 26].  Individual defendant Avery filed a separate motion joining the motion to dismiss [Docket No. 28].  Defendants argue that the claims in the amended complaint are based on acts that took place before plaintiffs purchased shares fail to comply with Rule 23.1(b)(1).  Defs.' Mot at 7-9. Further, defendants argue that the amended complaint does not comply with Rule 23.1(b)(3) because plaintiffs did not make a demand on the board before filing this derivative action and fail to allege with particularity facts showing that such demand would have been futile.  *Id.* at 10-22.  Finally, defendants argue that, even if the amended complaint meets the requirements of Rule 23.1, plaintiffs' substantive claims fail under 12(b)(6) because they do not allege any corporate injury.  *Id.* at 22-23.

In considering a motion to dismiss under Rule 23.1, the court must accept all the well-pled allegations as true.  *Andropolis v. Snyder*, No. 05-cv-01903-EWN-BNB, 2006 WL 2226189 at *5 (D. Colo. Aug. 3, 2006) (citing *Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 886 (Del. Ch. 1999)).  Conclusory allegations, however, will not be accepted as true.  *Id.*

### A.  Stock Ownership Requirement

Federal Rule of Civil Procedure 23.1 requires that a shareholder derivative complaint allege that "the plaintiff was a shareholder or member at the time of the transaction complained of, or that the plaintiff's share or membership later devolved on

6

it by operation of law." Fed. R. Civ. P. 23.1(b)(1).  This "contemporaneous ownership rule" is a procedural requirement and therefore applies in diversity cases such as this one.  *See Cadle v. Hicks*, 272 F. App'x 676, 678 (10th Cir. 2008).

Plaintiffs allege that they owned IPI stock "at times relevant" to the events described in the amended complaint; however, defendants point out that "they do not – and cannot – allege that they were shareholders prior to the IPO."  Defs.' Mot. at 7.  If transactions material to plaintiffs' claims occurred prior to any member of the public being able to purchase IPI's stock, plaintiffs cannot satisfy Rule 23.1 as to those transactions.  *See* Fed. R. Civ. P. 23.1(b)(1).

Plaintiffs make no allegation as to when shares of IPI were first traded.  Instead, plaintiffs refer to "the completion of the IPO."  *See* Am. Compl. ¶ 55.  Moreover, plaintiffs provide varying dates for the IPO's completion – April 17, 2008, Am. Compl. ¶ 55, and April 25, 2008, Am. Compl. ¶ 4.

Although at the motion to dismiss stage the Court must generally accept all the allegations in the amended complaint as true, it may also consider matters of which a court may take judicial notice.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Courts commonly take judicial notice of publicly traded stock, *see, e.g.*, *S.E.C. v. C. Jones & Co.*, No. 03-cv-00636-WDM-KLM, 2009 WL 321696 at *1 (D. Colo. Feb. 10, 2009), and can consider on a motion to dismiss "public disclosure documents required by law to be, and that have been, filed with the SEC."  *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).  On April 17, 2008, IPI filed a letter from the New York Stock Exchange ("NYSE") with the SEC, indicating the NYSE's approval of listing IPI's stock.  The letter indicates IPI's stock's "[t]entative listing date" as "April 22,

7

2008." A Notice of Effectiveness on file with the SEC also indicates that IPI's Form S-1 (the registration statement) became effective on April 21, 2008 at 5:30 p.m. Given these public SEC filings, the Court takes judicial notice pursuant to Fed. R. Evid. 201 of the fact that IPI's stock was not publicly traded until April 22, 2008. Therefore, plaintiffs could not have owned stock prior to April 22, 2008.

As a result, according to the contemporaneous ownership rule, plaintiffs cannot base any of their claims on transactions that took place prior to April 22, 2008. *See* Fed. R. Civ. P. 23.1(b)(1); *Lefort v. Black*, No. C02-2465 VRW, 2003 WL 1563997 at *3-*4 (N.D. Cal. Mar. 21, 2003) (dismissing plaintiff's complaint for lack of standing where he failed to allege facts supporting an inference he owned stock at the time of a challenged IPO). Plaintiffs therefore do not have standing to challenge IPI's purchase of Intrepid Mining, as plaintiffs allege this transaction took place on April 21, 2008. *See* Am. Compl. ¶ 55; Fed. R. Civ. P. 23.1(b)(1); *see also Lefort*, 2003 WL 1563997 at *3 -*4.

### B.  Demand Requirement

In addition to the contemporaneous ownership rule, plaintiffs in shareholder derivative actions must also meet the demand requirement. Shareholder derivative suits can only proceed where the plaintiff alleges with particularity "any effort by the plaintiff to obtain the desired action from the directors" and "the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1. As Rule 23.1 is a procedural requirement, the question of whether Rule 23.1 is satisfied is a matter of federal law. However, federal courts look to the law of the state of incorporation, here Delaware, as the appropriate source of federal common law in determining whether the

8

demand requirement is met.  *See Cadle*, 272 F. App'x at 678; *see also Rist v. Stephenson*, 05-cv-02326-PSF-CBS, 2007 WL 2914252 at *3 (D. Colo. Oct. 1, 2007).

Under Delaware law, the demand requirement is a "'substantive right designed to give a corporation the opportunity to rectify an alleged wrong without litigation, and to control any litigation which does arise.'"  *Braddock v. Zimmerman*, 906 A.2d 776, 784 (Del. 2006) (quoting *Aronson v. Lewis*, 473 A.2d 805, 809 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)).  The demand requirement "gives the directors - even interested, nonindependent directors - an opportunity to consider or reconsider the issue in dispute."  *Kenny v. Koenig*, 426 F. Supp. 2d 1175, 1181 (D. Colo. 2006) (quoting *Werbowsky v. Collomb*, 766 A.2d 123, 144 (Md. 2001)).

Plaintiffs here admit that they did not make a demand on IPI's board to bring the claims alleged in their amended complaint but instead allege that such a demand would have been futile.  Am. Compl. ¶ 70.  Delaware courts apply two different tests to determine when plaintiffs are excused from making a demand on the board.  The first is the test articulated by the Delaware Supreme Court in *Aronson* and looks to whether the complaint contains "particularized facts creating a reason to doubt that (1) the directors are disinterested and independent [or that] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.'"  *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) (quoting *Aronson*, 473 A.2d at 814).  However, this test is not appropriate where the challenged conduct "does not involve a specific decision of the board of directors. . . ."  *Rist*, 2007 WL 2914252 at *3 (citing *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993)).  Where the plaintiffs do not challenge a particular board

action, the *Rales* test applies and the second prong of the *Aronson* test is eliminated. *Id.* The proper inquiry then becomes whether the "particularized factual allegations of the complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934.

Plaintiffs urge the Court to apply the *Aronson* test to all the challenged transactions. Pls.' Br. in Opp. to Defs.' Mot. [Docket No. 32, "Pl.'s Br."] at 6. Nonetheless, because some transactions involve board decisions, while others do not, the Court will apply the *Aronson* test to the former and the *Rales* test to the latter. Further, although plaintiffs' brief does not apply these tests to particular challenged transactions and board members, Delaware courts generally analyze demand futility "director-by-director and transaction-by-transaction," which is what the Court will do here. *Khanna v. McMinn*, No. Civ. A. 20545-NC, 2006 WL 1388744 at *14 (Del. Ch. May 9, 2006); *see also Cal. Pub. Employees' Ret. Sys. v. Coulter*, No. Civ. A. 19191, 2002 WL 31888343 (Del. Ch. Dec. 18, 2002) (analyzing the interestedness of each director as to each challenged transaction)).

Because the first prong of the *Aronson* test, looking at interestedness and independence, is identical to the entirety of the *Rales* test, the Court will first examine the interestedness and independence of IPI's board generally and the directors individually. *See In re Nutrisystem, Inc. Deriv. Litig.*, 666 F. Supp. 2d 501, 511 (E.D. Pa. 2009) (analyzing the first prong of *Aronson* and *Rales* together). Next, the Court will turn to those challenged transactions involving particular board actions and apply the second prong of *Aronson*.

10

1.  *Aronson* Prong One and *Rales*

a.  Legal Standard

Under *Rales* and the first prong of *Aronson*, demand will be excused where the plaintiff has alleged particular facts creating a reasonable doubt that a majority of the directors, looking at the board at the time the amended complaint was filed, was disinterested or independent. *Aronson*, 473 A.2d at 814-15; *Rales*, 634 A.2d at 934.   A director is interested "if he will be materially affected, either to his benefit or detriment, by a decision of the board, in a manner not shared by the corporation and the stockholders." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995) (citing *Rales*, 634 A.2d at 936).   The "mere threat" of personal liability as a defendant in the derivative action does not render a director interested; rather, the risk of liability must rise to a "substantial likelihood." *Id.*

In the demand excusal context, directors are presumed independent. *Beam v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004).   However, plaintiffs can allege sufficient facts to overcome this presumption where they establish that a director's decision is not "based on the corporate merits of the subject before the board," but rather on "extraneous considerations or influences." *Aronson*, 473 A.2d at 816.   A director's lack of independence can be established where another person or entity "has the direct or indirect unilateral power to decide whether the director continues to receive a benefit upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to" objectively consider the merits of the demand. *Rist*, 2007 WL 2914252 at *9 (quoting *Telxon Corp. v. Meyerson*, 802 A.2d 257, 264 (Del. 2002)).   Thus, where a minority of

11

directors is interested in a particular transaction, a plaintiff may still plead sufficient facts to satisfy *Aronson*'s first prong if he demonstrates that a director with an interest in a particular transaction dominated or controlled the board such that a majority of the board could not exercise independent judgment on the issue.  *See Rales*, 634 A.2d at 936 (turning to independence analysis after determining that only a minority of directors were interested).

The IPI board, at the time of filing, consisted of five directors: Jornayvaz, Harvey, Martin, Considine and Whitham.  To meet the *Rales* test and the first prong of the *Aronson* test plaintiffs must allege particular facts raising a reasonable doubt that three out of the five of these directors were disinterested or independent as to each wrongful transaction alleged in the amended complaint.

### b.  General Allegations as to All Defendants

As a preliminary matter, the Court notes that the amended complaint sets forth several generalized allegations as to the board's interestedness and lack of independence as a whole.  In the interest of efficiency, the Court examines these allegations before turning to those involving the individual directors.

### i.  Independence

Plaintiffs repeatedly allege that the board is "dominated" by defendants Jornayvaz, Harvey, and Martin.  Am. Compl. ¶ 71.  Mere conclusory allegations of dominance will not suffice to show lack of independence, and the "shorthand shibboleth of 'dominated and controlled directors' is insufficient."  *Aronson*, 473 A.2d at 816

(quoting *Kaplan v. Centex Corp.*, 284 A.2d 119, 123 (Del. Ch. 1971)).  Plaintiffs further assert that these three directors control "at least 40 percent ownership" in IPI.  However, "stock ownership alone, at least when it amounts to less than a majority, is not sufficient to prove domination or control."  *Kenny v. Koenig*, 426 F. Supp. 2d 1175, 1186 (D. Colo. 2006) (finding that allegation that directors collectively owned 40% of company's stock was insufficient to show control) (quoting *Aronson*, 473 A.2d at 815).   Moreover, Plaintiffs repeatedly allege that Jornayvaz, Harvey, and Martin hatched a "scheme to exploit the company" and conspired with one another to disguise each other's violations of the law and breaches of fiduciary duty.  *See, e.g.*, Am. Compl. ¶¶ 28-31, 55.  The amended complaint, however, does not support these broad allegations with particular facts.  The purchase of Intrepid Mining is the only transaction plaintiffs challenge which stood to benefit all three of these defendants, and plaintiffs do not have standing to challenge it.  *See* Am. Compl. ¶¶ 31-38, 55.  Plaintiffs' conclusory assertions of a conspiracy and scheme to bleed the company dry do not meet the particular pleading requirements of Rule 23.1.  See Fed. R. Civ. P. 23.1; *Aronson*, 473 A.2d at 816.

### ii.  Interest

The plaintiffs also seek to excuse demand on the ground that all the directors face a substantial risk of liability because they "exhibited a systematic failure to fulfill their fiduciary duties" by approving the various wrongful transactions challenged in the amended complaint.  Am. Compl. ¶ 87.  Similarly, plaintiffs generally allege that the board's Audit Committee, consisting of defendants Considine, Martin and Whitham, face a substantial likelihood of liability because they "over[saw] and directly monitor[ed] the self-dealing transactions detailed" in the amended complaint.  Am. Compl. ¶ 78.

Plaintiffs make a similar allegation as to the Nominating and Governance Committee, which has the same members.  Am. Compl. ¶ 76.  However, conclusory allegations that "directors approved of, or acquiesced to the conduct in question, unsupported by specific facts, are insufficient to demonstrate bias or a lack of independence."  *In re Storage Tech. Corp. Secs. Litig.*, 804 F. Supp. 1368, 1375 (D. Colo. 1992), *overruled on other grounds by Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1254 (10th Cir. 1997).  Plaintiffs provide no specific facts indicating that any of the directors knew about and nonetheless approved the complained-of transactions.  *See id.*

Plaintiffs also allege that the defendants breached their fiduciary duties by failing to "put in place proper internal controls and systems of corporate governance . . . ."  Am. Compl. ¶ 92; Pls.' Br. at 13.  This type of claim, alleging the directors breached their duties of good faith and loyalty by failing to monitor corporate performance, is governed by *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 968-70 (Del. Ch. 1996).  As *Caremark* explained, this is a very difficult claim to pursue and requires proof of a "sustained or systematic failure of the board to exercise oversight-such as an utter failure to attempt to assure a reasonable information and reporting system exists . . . ."  *Id.* at 971.  Plaintiffs have alleged no particularized facts to show a systematic failure of oversight at IPI.  Rather, the only incidents plaintiffs identify to demonstrate lack of oversight by the board's committees are the alleged misrepresentations in the registration statement, including the misrepresentation of Avery's education.  *See* Pls.' Br. at 10, 13.  These isolated misrepresentations, along with plaintiffs' conclusory allegations that defendants "knew or should have known" about them, do not rise to the level needed to create a substantial risk of defendants' liability for a systematic failure of

14

oversight.  *See* Am. Compl. ¶ 73; *Caremark*, 698 A.2d at 968-70.  The Court finds that

the plaintiffs have failed to show that the directors face a substantial risk of liability on

plaintiffs' *Caremark* claim.[4]


c.  Individual Defendants

i.  Jornayvaz and Harvey

*(A) Interest*

Plaintiffs argue that defendants admit Jornayvaz and Harvey could not

independently evaluate a demand from the plaintiffs because they both are principally

employed by IPI and receive over a million dollars in compensation from the company.

Pls.' Br. at 6.  Plaintiffs' amended complaint includes allegations regarding the large

compensation packages awarded to Jornayvaz as IPI's CEO and President and to

Harvey as IPI's CTO.  Am. Compl. at ¶ 80-81.  Courts applying Delaware law have held

that a full-time managerial employee's incentive to keep his or her job can be sufficient

to show interestedness for a demand futility analysis.  *See In re The Student Loan Corp.*

*Derivative Litig.*, No. C.A. 17799, 2002 WL 75479 at *3 (Del. Ch. Jan. 8, 2002) (finding

board members were not disinterested as to demand, which required board members to

---

[4] Plaintiffs' brief adds that the Governance Committee "met only twice in 2008."
Pls.' Br. at 12.  This fact is insufficient to show lack of oversight even when viewed in
conjunction with plaintiffs' allegations that defendants "knew or should have known"
about misrepresentations in the registration statement.  *See Guttman v. Huang*, 823
A.2d 492, 507 (Del. Ch. 2003) (stating that to plead a *Caremark* claim plaintiff must
allege facts such as "that the company lacked an audit committee, that the company
had an audit committee that met only sporadically and devoted patently inadequate time
to its work, or that the audit committee had clear notice of serious accounting
irregularities and simply chose to ignore them. . . .").

sue their employing company); *In re Veeco Instruments, Inc. Secs. Litig.*, 434 F. Supp. 2d 267 (S.D.N.Y. 2006) (finding CEO director was not disinterested in part because company was the substantial source of director's income).  Here, plaintiffs allege that IPI is Jornayvaz and Harvey's primary employment.  Am. Compl. at ¶ 80-81.  Thus, plaintiffs have sufficiently alleged that Jornayvaz and Harvey are not disinterested directors for purposes of the demand futility analysis.  *See In re The Student Loan,* 2002 WL 75479 at *3.

However, the Court's finding that Jornayvaz and Harvey are interested directors does not end the *Aronson* prong one analysis.  As to each challenged transaction, plaintiffs must also allege that one of the outside directors - Martin, Considine or Whitham - was also interested or dominated by Jornayvaz or Harvey such that a majority of the board could not exercise independent judgment as to the propriety of the transaction.  *See Rales*, 634 A.2d at 936.  Therefore, the Court analyzes the interestedness and independence of each of the other IPI directors in turn.

<u>ii.  Martin</u>

*(A) Independence*

Plaintiffs generally allege that Martin lacks independence because of his "interlocking professional, business and personal relationships with" IPI, Harvey, and Jornayvaz.  Am. Compl. ¶ 82.  These interlocking relationships consist of Martin's prior ownership of Intrepid Mining with Jornayvaz and Harvey and that Jornayvaz and Harvey have large investments in a private equity firm managed by Martin.  Am. Compl. ¶¶ 82, 83.  None of these relationships, however, suggest that Martin was "beholden" to Jornayvaz and Harvey so as to overcome the presumption of Martin's independence.

16

*See Beam*, 845 A.2d at 1048-49.  The mere fact that Jornayvaz, Harvey, and Martin "developed business relationships before joining the board" is insufficient to show that Martin was controlled by Jornayvaz and Harvey or vice-versa.  *See id.* at 1051.

*(B) Interest*

Plaintiffs also allege that Martin is not disinterested because he engaged in illegal insider trading.  Am. Compl. ¶¶ 82, 85.  As explained in *Guttman v. Huang*, 823 A.2d 492, 503 (Del. Ch. 2003), the fact that a director is accused of insider trading does not automatically make that director "interested" for the purpose of a demand excusal analysis.  Instead, for plaintiffs to show that Martin is interested they must allege facts showing that Martin faces "a sufficiently substantial threat of personal liability" as to this charge, compromising his ability to act impartially on a demand that it be pursued.  *See id.*

In order for Martin to face a substantial likelihood of personal liability for insider trading, the amended complaint must allege that Martin possessed material, nonpublic information about IPI's performance at the time he sold his shares and that he sold his shares because he was "motivated, in whole or in part, by the substance of that information."  *Pfeiffer v. Toll*, 989 A.2d 683, 691 (Del. Ch. 2010) (quoting *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004)); *Guttman*, 823 A.2d at 505.[5]  Plaintiffs' conclusory allegations that Martin sold nearly all his shares at a substantial profit  "while in possession of material non-public information that [IPI] refused to divulge to the

---

[5] Defendants raise the question of whether insider trading claims continue to be viable causes of action in a derivative action under Delaware law.  Defs.' Mot. at 21. The Delaware Court of Chancery, however, continues to recognize these claims in derivative actions.  *See, e.g.*, *Pfieffer*, 989 A.2d at 695-708.

investing public," does not allege particularized facts supporting a rational inference that Martin possessed insider information which then motivated his decision to sell his shares. *See id;* Am. Compl. ¶ 82. Plaintiffs allege that IPI's stock price had risen in the weeks prior to Martin's sale due to rumors that IPI was going to be taken over and that IPI declined to comment on these reports when asked about the rumors by the NYSE. Am. Compl. ¶¶ 66, 67. Plaintiffs do not allege that Martin knew the source of such rumors or knew anything more about them than the market did. In fact, plaintiffs do not even allege that Martin acted on this information by selling his shares. *See Pfieffer*, 989 A.2d at 691. Plaintiffs, therefore, have not pled sufficient facts to show that Martin faced a substantial likelihood of liability. *See Guttman*, 823 A.2d at 505.

### iii.  Considine

#### (A) Independence

Plaintiffs allege that Considine lacks independence because he is controlled by Martin. Am. Compl. ¶ 84. Martin serves as chairman of the compensation committee on the board of the company at which Considine is employed as President and CEO. *Id.* These allegations, even if sufficient to show domination, are irrelevant as Martin himself is a disinterested director, as explained above. Plaintiffs do not challenge any transactions in which Martin was interested such that his influence over Considine would be relevant.

#### (B) Interest

Plaintiffs do not allege that Considine was involved in or benefitted from any of the challenged transactions. Their only allegation as to his interestedness is that he

18

served on the Audit and Nominating and Governance Committees and, as explained

above, he does not face a substantial likelihood of liability based on those facts alone.

iv.  Whitham

Plaintiffs make no allegations as to the interestedness or lack of independence of

defendant Whitham beyond the conclusory allegations as to the Audit and Nominating

and Governance Committees discussed earlier.  *See* Am. Compl. ¶¶ 76-86.  Whitham is

therefore also disinterested and independent.

d.      Summary as to Board's Interest and Independence

In summary, the Court concludes that, although defendants Jornayvaz and

Harvey were interested so as to render a demand upon them futile, the plaintiffs have

failed to plead particularized facts raising doubts about the disinterestedness and

independence of the other three members of the board.  Because the other three board

members consitute a majority, plaintiffs have failed to show that demand was excused

under the first prong of *Aronson* or under *Rales.  See Aronson*, 473 A.2d at 814; *Rales*,

634 A.2d at 934.

**2.  Business Judgment**

a.  Relevant Transactions

Next, the Court turns to the second prong of *Aronson*, which looks at business

judgment.  *Aronson*, 473 A.2d at 814.  The second prong of *Aronson* only applies to

those challenged transactions that were the result of board action.  *See Rales*, 634 A.2d

at 933 (reasoning that "[t]he absence of board action . . . makes it impossible to perform

19

the essential inquiry contemplated by *Aronson* - whether the directors acted in conformity with the business judgment rule in approving the challenged transaction"). Plaintiffs do not allege whether each transaction they challenge was or was not the product of board action.  They do, however, allege that the board's Audit Committee oversaw "the self-dealing transactions" alleged in the amended complaint and that it "rubber stamp[ed] the wishes and desires" of defendants Jornayvaz, Harvey, and Martin.  *See* Am. Compl. ¶ 78.  By "self-dealing transactions," plaintiffs seem to refer to the transition services agreement with Intrepid Oil, the subleases with the Larrk Foundation and Intrepid Production, and the dry-lease agreements with BH Holdings, LLC and Intrepid Production Holdings, LLC.[6]  *See* Am. Compl. ¶ 58-61.  The Court therefore applies *Aronson*'s second prong to these transactions.[7]

> b.  Legal Standard

In order to satisfy the second prong of *Aronson*, plaintiffs must plead particularized facts creating a reasonable doubt that "the challenged transaction was otherwise the product of a valid exercise of business judgment."  *Aronson*, 473 A.2d at 814.  Directors are presumed to have "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Id.* at

---

[6] Plaintiffs also refer to the purchase of Intrepid Mining as one of these "self-dealing transactions."  *See* Am. Compl. ¶ 55-57.  The Court will not discuss this transaction here, however, as plaintiffs do not have standing to challenge it.

[7] In addition to these transactions, plaintiffs challenge the alleged misrepresentations in IPI's Registration Statement, defendant Avery's misrepresentations regarding his education, and defendant Martin's alleged insider trading.  *See* Am. Compl. ¶¶ 49-53, 62-64, 65-67.  Plaintiffs do not allege that these incidents were approved by the board and, therefore, only the *Rales* test applies to them.

812.  To rebut this presumption, plaintiffs must raise "a reason to doubt whether the board's action was taken on an informed basis or whether the directors honestly and in good faith believed that the action was in the best interests of the corporation."  *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003).  Plaintiffs' burden here is quite high, generally requiring allegations showing gross negligence or corporate waste.  *See Khanna*, 2006 WL 1388744 at *23 (citing *Aronson*, 473 A.2d at 812; *Brehm*, 746 A.2d at 259; *Kahn v. Tremont Corp.*, Civ. A. No. 12339, 1994 WL 162613 at *6 (Del. Ch. April 22, 1994)).

> c.  Individual Transactions

> i.  Transition Services Agreement

Plaintiffs allege IPI entered into a transition services agreement with Intrepid Oil which allowed Intrepid Oil to drill an oil and gas well on the property under IPI's Moab Mine, promised Intrepid Oil the use of 15% of IPI employees' time for accounting, geology, land title, and engineering services, gave Intrepid Oil the sole option of terminating the agreement at any time with 30 days notice, and assured Intrepid Oil that IPI would purchase the well back if it did not produce at commercially viable levels.  Am. Compl. ¶ 44.  Plaintiffs characterize the agreement as a "sweetheart" deal because of its favorable terms and because IPI had "lobbied extensively" to prohibit outside companies from drilling above its mines, but allowed Intrepid Oil to do so.  Am. Compl. ¶ 45.

Beyond plaintiffs' allegation that the terms of the transition services agreement were particularly favorable to Intrepid Oil because Jornayvaz and Harvey owned the company, plaintiffs have made no allegations that would suggest the approval of this

transaction was not a product of a valid exercise of business judgment by the IPI board. While Jornayvaz and Harvey were interested in the transaction, the three outside members of the board were not. Nothing in the amended complaint beyond the conclusory allegation that the outside directors rubber-stamped self-dealing transactions suggests that the board was plagued by any procedural deficiencies or failed to adequately evaluate the transaction. *See* Am. Compl. ¶ 78. Nor do the plaintiffs allege specific facts showing that the outside directors acted in bad faith, were not fully informed regarding the agreement's terms, or otherwise acted with gross negligence. *See* Am. Compl. ¶ 78; *In re Walt Disney*, 825 A.2d at 286; *Brehm*, 746 A.2d at 259. Certainly the amended complaint does not allege sufficient facts to indicate that the agreement amounted to corporate waste, as the plaintiffs do not provide any facts regarding the inadequacy of the value IPI received from Intrepid Oil. *See Brehm*, 746 A.2d at 263 (describing waste as "'an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.'" (quoting *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993))). Consequently, plaintiffs have not alleged particularized facts raising a doubt that the transition services agreement was the product of a valid business judgment. *See Aronson*, 473 A.2d at 814.

ii. Subleases

Plaintiffs similarly allege that IPI signed subleases for office space with two entities in order to benefit defendant Jornayvaz. The subleases were with the Larrk Foundation, a non-profit organization whose trustees include Jornayvaz and his wife, and Intrepid Production, a company wholly owned by Jornayvaz. Am. Compl. ¶ 59.

22

Plaintiffs characterize the leases as "gifts" because they included provisions "for lease abatement in full for 90 days and in part for a further 180 days," meaning that Larrk and Intrepid Production did not have to make full lease payments until September 2009. *Id.*

Plaintiffs again provide no facts beyond conclusory allegations intimating that the majority of uninterested board members exercised dubious business judgment in approving these subleases. The plaintiffs state the monthly rent IPI received from the leases, but they do not allege that this amount was inadequate. That the leases contained rent abatement terms is insufficient to show that they were so valueless as to constitute corporate waste. *See Brehm*, 746 A.2d at 263.

iii. Dry Lease Agreements

Plaintiffs allege that IPI entered into dry lease agreements for the use of aircraft with entities owned or controlled by Jornayvaz and Harvey. Am. Compl. ¶ 60-61. First, plaintiffs allege that IPI signed a dry lease agreement with BH Holdings, LLC, an entity "created" by Jornayvaz and Harvey, to rent aircraft at a cost of $4,429 per flight hour. Am. Compl. ¶ 60. Plaintiffs allege Jornayvaz and Harvey are the "main beneficiaries" of this agreement and that it allows them to "personally profit when they fly on the Company's leased aircraft. . . ." *Id.* Second, plaintiffs allege IPI later entered into a dry lease agreement with Intrepid Production Holdings, LLC, a company owned by Jornayvaz. Am. Compl. ¶ 61. Plaintiffs allege Intrepid Production Holdings charged $5,590 per flight hour, while private jet provider NetJets charges $3,812 per flight hour for a similar aircraft. Am. Compl. ¶ 61, n.3.

Plaintiffs do not provide non-conclusory allegations indicating that the outside directors of the board failed to exercise proper business judgment in approving these

agreements.  The fact that other providers charged less for comparable services,

assuming such services were comparable, does not show that these agreements were

"so one sided" as to constitute corporate waste, nor do plaintiffs allege as much.  *See*

*Brehm*, 746 A.2d at 263.

d.       Summary as to Business Judgment

Plaintiffs have not alleged facts that suggest that any of the challenged

transactions was not a valid exercise of the board's business judgment.  The plaintiffs

make no non-conclusory allegations that the outside directors, who were disinterested

in the transactions, failed to act in good faith and with full information regarding each

transaction.  Further, none of the plaintiffs' allegations as to the terms of these

transactions are sufficient to allege that the deals constituted corporate waste.  The

plaintiff has therefore failed to establish demand futility with respect to these

transactions under the second prong of the *Aronson* test.

*3.  Demand is Not Excused*

The factual allegations in the plaintiffs' amended complaint have failed to

establish that a demand on IPI's board would be futile.  The allegations, taken as true,

do not create a reasonable doubt as to whether the directors are disinterested and

independent or whether the specific actions taken by the board were the product of the

valid exercise of business judgment.  Accordingly, under either the *Aronson* or *Rales*

tests demand here is not excused, and the plaintiffs' derivative amended complaint

must be dismissed.

**C.  Plaintiffs' Request for Leave to Amend**

24

In a single sentence at the conclusion of their brief, plaintiffs ask for leave to amend their complaint in the event the Court grants defendants' motion to dismiss.  Pl.s' Br. at 24.  The Local Rules in this District state that a "motion shall not be included in a response or reply to the original motion," but rather "shall be made in a separate paper." D.C.COLO.LCivR 7.1.C.  No motion to amend is pending before this Court.  *See Calderon v. Kansas Dep't of Social and Rehabilitation Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999) ("We have recognized the importance of Fed. R. Civ. P. 7(b) and have held that normally a court need not grant leave to amend when a party fails to file a formal motion."); *McNamara v. Pre-Paid Legal Servs., Inc.*, 189 F. App'x 702, 719 (10th Cir. 2006) (unpublished) ("Plaintiffs failed to adequately request amendment and to support that request.  Consequently, the district court did not err in dismissing this case without leave to amend."); *see also Blythe v. Southwest Airlines Co.*, No. 10-2047, 2010 WL 2473863, at *3 (10th Cir. June 18, 2010) (concluding that plaintiff's request, in response to a motion to dismiss, for sixty days to amend her complaint failed to "'give adequate notice to the district court and to the opposing party of the basis of the proposed amendment'" and, therefore, "the district court correctly denied her leave to amend her complaint") (quoting *Calderon*, 181 F.3d at 1186-87).  Moreover, plaintiffs have made no indication that they could allege particularized facts that would satisfy the demand futility requirement.  Therefore, even considering plaintiffs' request to amend their complaint, the Court finds that amendment would be futile.

## III. CONCLUSION

The plaintiffs' amended complaint will be dismissed for failure to plead demand futility as required by Rule 23.1.  In light of the Court's finding that plaintiffs failed to

adequately plead demand futility, it is unnecessary to consider defendants' argument that plaintiffs have also failed to state any claims under Rule 12(b)(6).  For the foregoing reasons, it is

**ORDERED** that defendants Intrepid Potash, Inc., Robert Jornayvaz III, Hugh Harvey Jr., J. Landis Martin, Terry Considine, and Barth Whitham's Motion to Dismiss the Amended Complaint is [Docket No. 26] is GRANTED.  It is further

**ORDERED** that defendant Patrick Avery's Motion to Dismiss/Joinder in Intrepid Potash, Inc., Robert Jornayvaz III, Hugh Harvey Jr., J. Landis Martin, Terry Considine, and Barth Whitham's Motion to Dismiss [Document No. 26] the Amended Complaint [Docket No. 28] is GRANTED.  It is further

**ORDERED** that this case is DISMISSED with prejudice.


DATED November 29, 2010.


BY THE COURT:


s/ Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge